UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JOHN KWESELE,

               Plaintiff,

   v.

KING COUNTY, et al.,

             Defendants.

No. 2:17-cv-1426-RAJ

ORDER

     This matter comes before the Court on a Motion for Summary Judgment Dismissal of Plaintiff's Claims filed by Defendants King County, Tom Jones, Josh Shields, Terry Rhoads, Michael Avery, *et. al.* ("Defendants"). Dkt. # 20.[1] Plaintiff John Kwesele ("Plaintiff") opposes the Motion, and Defendants have filed a Reply. Dkt. ## 27, 35. For the reasons stated below, the Court **GRANTS** Defendants' Motion.

## I.    BACKGROUND

     King, Snohomish, and Pierce Counties created Central Puget Sound Regional

---

[1] The Court notes that both parties' briefs contain numerous footnoted legal citations. The Court strongly disfavors footnoted legal citations. Footnoted citations serve as an end-run around page limits and formatting requirements dictated by the Local Rules. *See* Local Rules W.D. Wash. LCR 7(e). Moreover, several courts have observed that "citations are highly relevant in a legal brief" and including them in footnotes "makes brief-reading difficult." *Wichansky v. Zowine*, No. CV-13-01208-PHX-DGC, 2014 WL 289924, at *1 (D. Ariz. Jan. 24, 2014). The Court strongly discourages the parties from footnoting their legal citations in any future submissions. *See Kano v. Nat'l Consumer Co-op Bank*, 22 F.3d 899-900 (9th Cir. 1994).

Transit Authority ("Sound Transit") as an independent agency to build a regional rapid transit system. Dkt. # 23, ¶3. Link Light Rail ("Light Rail") service began in King County in late 2009 and has been expanding since as voters approve new funding. *Id.* Sound Transit contracts with King County Metro Transit to provide operations and maintenance services for Light Rail. *Id.* Light Rail train operators and their supervisors are King County employees. *Id.* Sound Transit also contracts with the King County Sheriff's Office for police services. *Id.* Sound Transit officers are King County employees who patrol Sound Transit property, including buses, trains, and stations. *Id.* Sound Transit contracts with a private security company to provide Fare Enforcement Officers to enforce payment of fares on Light Rail; these officers are not sworn law enforcement officers and are not King County employees. *Id.*

Initially, the Light Rail division of King County Metro ("Rail") operated under the Collective Bargaining Agreement with Amalgamated Transit Union Local 587 that covered the period November 1, 2007 through October 31, 2010. Dkt. # 23, ¶ 5. Afterwards, the Union and King County Metro negotiated a new CBA which covered November 1, 2010 through October 31, 2013. *Id.* at ¶6. The 2010 CBA included specific provisions for discipline, set forth a new process for recruiting RSIT candidates, and allowed for outside recruitment if no qualified internal candidates were available. *Id.* It stipulated that Bus Supervisors coming to Rail as Rail Supervisors would have a six month probationary period. *Id.* It further explained that Rail Supervisors who did not come from Bus Supervisor positions would have a twelve-month probationary period. *Id.* The 2010 CBA also provided that probationary employees who had no right to return to the Bus Division were subject to termination in the sole discretion of Rail and had no grievance or arbitration rights. *Id.* at Ex. A, p. 17.

Rail management and the Union met and developed an RSIT program in 2010-2011. Dkt. # 23, ¶7. The program consisted of a yearlong training program with

modules on Field Qualifications, Dispatcher Qualification, and Link Control Center Qualifications ("LCC"). *Id.* It included standards of behavior, performance standards, requirements for qualification, and an explanation of RSIT probationary status as well as relevant standard operating procedures. *Id.*, Ex. B. In this program, after successfully completing the RSIT program and probation, trainees would receive the official title of Rail Supervisor. *Id.* at ¶¶ 11-12.

1. Plaintiff's Employment as an RSIT

Plaintiff, a United States citizen who was born in Africa, was hired by the Metro Bus division of King County as a Bus Operator on October 30, 1998. Dkt. # 28, ¶¶ 1, 7. On March 9, 2009, Plaintiff voluntarily transferred to Rail as a Rail Operator. *Id.* On March 30, 2012, Plaintiff resigned his position to tend to familial concerns. Dkt. # 23, Ex. C; *see also* Dkt. # 21, Ex. A, at 48:9-1; Ex. D, at 32:8-33:4. Plaintiff's last day as a Rail Operator was April 15, 2012. Dkt. # 23, ¶ 13. However, as of February 21, 2012, Plaintiff had already been hired as a Rail Transit Supervisor for the Los Angeles County Metropolitan Transportation Authority. Dkt. # 21, Ex. A, 49:4-19; Ex. C, at 74:16-75:5; Ex D, at 32:8-33:4.

In October 2012, Rail accepted applications from outside of Metro for Rail Supervisor. Dkt. # 23, ¶¶ 14-15. Plaintiff applied for the position on October 15, 2012. *Id.,* ¶ 15. In a letter dated January 18, 2013, Rail notified Plaintiff that he had been selected for the RSIT position. Dkt. # 21, Ex. E, at 18: 19-21; Dkt. # 23, ¶12. On February 4, 2013, Plaintiff entered the second RSIT class which was made up of two other trainees, Jeff Wachtel and Santiago Maciel. Dkt. # 23, ¶ 16, Ex. E. Plaintiff's class was also the only RSIT class, up until that time or since, which included candidates that did not come from within Metro but were instead hired from outside the County through an open and competitive recruitment. *Id.*

On March 7, 2013, about a month into his job, Plaintiff was training as an RSIT with his instructor Bryan Mathews and fellow-RSIT Jeff Wachtel. Dkt. # 28, ¶¶ 25-

26. Both Mathews and Wachtel are white. *Id*. Plaintiff was on duty, but not in uniform. All three boarded the train at the Rail staff-only stop just west of the Beacon Hill tunnel to begin their training. This stop does not have a card reader where riders tap their ORCA cards. *Id.,* ¶ 25. Supervised by Mathews, Plaintiff had driven the train southbound to SeaTac Airport station and was seated in the second car awaiting his turn while Wachtel drove the train northbound into downtown Seattle. *Id*.

When the train arrived at the Beacon Hill station at approximately 7:00 PM, two white Fare Enforcement Officers ("FEOs") boarded the train. Dkt. # 22, ¶ 5, Ex. A. The FEOs announced they were conducing fare inspections and instructed all passengers to present proof of payment. *Id*. at Ex. A. When one of the FEOs asked Plaintiff for proof of fare, he presented his ORCA card as proof of payment. The FEO checked the ORCA card, and it revealed that the card had not been used to pay for the ride, whereafter the FEO then instructed Plaintiff to present identification. *Id*. at Exs. A, B. Plaintiff then presented his ORCA card and his Training ID card to the FEO, which contained his name, his title of Rail Supervisor, and a color photograph of him. Dkt. # 28, ¶ 27. Plaintiff explained that because he was on duty, he was not required to tap his ORCA card. *Id*. Plaintiff claims the FEOs laughed when he told them he was a supervisor. *Id*. The FEO instructed Plaintiff to leave the train at the SODO station, and Plaintiff requested that the FEOs call the Link Control Center ("LCC") to verify his identity, though the FEOs did not do so. *Id*. Plaintiff then used his employee key to open the door to the vacant operator compartment at the back of the train, stepped inside, and locked the door. Dkt. # 21, Ex. A, at 87:7-23; Dkt. # 22, Ex. B. When Plaintiff refused to come out of the compartment, the FEOs called Sound Transit police. Dkt. # 22, Ex. A. Two deputies from the King County Sheriff's Office/Sound Transit Police Division boarded at the next stop and knocked on the door; when they did not hear a response, they opened the compartment door, and Plaintiff then stepped outside. Dkt. # 22, Exs. A, B; Dkt. # 28, ¶ 28. Plaintiff left the

compartment and train, was arrested and put into the back of a patrol car, and released shortly thereafter. *Id.*

On March 8, 2013, Plaintiff wrote a letter to his Rail Manager, Defendant Michael Avery, setting forth his version of events of the FEO incident and claimed the arrest was racially motivated. Dkt. # 22, Ex. B. The same day, Rail Field Operations Chief Max Lemke met with Plaintiff and interviewed him about the incident. *Id.* On March 18, 2013, following an investigation including the review of the video of the incident and the available reports and interviews, Defendant Tom Jones, Rail Operations Superintendent and Plaintiff's then-supervisor, determined that it was the FEOs' failures to check with the LCC or the rail operators which caused the situation. *Id.* at Ex. C. However, Mr. Jones also determined that Plaintiff's failure to respond and cooperate with Sound Transit Police was of "great concern" because of Plaintiff's escalation of the situation by locking himself in the cab of the train. *Id.* Mr. Jones decided to extend Plaintiff's probationary period, noting that this extension would not change Plaintiff's other terms of employment, or force Plaintiff to repeat any training. *Id.* Plaintiff signed that he agreed to this offer. *Id.* At this point, Plaintiff was the first and only RSIT to ever have his probation extended. Dkt. # 29, Ex. D, at 36:19-22.

In September 2013, Chief David Vestal took over the duties of Field Operations Chief and became Plaintiff's direct supervisor. Dkt. # 24, ¶¶ 4-5. On September 4, 2013, Plaintiff received two simultaneous calls while training in the LCC involving a problem with a train and a disabled bus in a transit tunnel; while Plaintiff claims to have asked Chief Gabriel Rukeyser to handle the train issue, Mr. Rukseyer claims that Plaintiff dropped the first call to focus solely on the second without telling anyone. *Id.* at ¶ 6; Ex. A. Plaintiff's supervisors contend that when they tried to talk to Plaintiff to offer corrective instruction he became argumentative and defensive, though Plaintiff disputes this characterization. *Id.*; Dkt. # 28, ¶ 40. When Chief Vestal

reviewed the incident, he was concerned that Plaintiff was unable to accept his mistakes. *Id.*

Mr. Vestal also claims that Plaintiff had a number of other performance lapses, including (1) in October 2013, continuing to perform peak hour ride checks despite specific instruction from Chief Vestal to refrain from doing so, and repeatedly not checking in with his supervisor during these shifts as instructed; (2) in December 11, 2013, refusing to operate a train to maintain service, one of the duties of an RSIT; (3) on December 23, 2013, failing to coordinate cleanup of vomit on a train and manage a situation with a bus being in the path of a train; and (4) on December 30, 2013, committing a number of errors which resulted in a fifteen minute delay for a train and a ten minute delay for several buses, and blaming his supervisor during the resulting investigation. Dkt. # 24, ¶¶ 11-12, 15, 16, Exs. B, G.

On February 11, 2014, Defendants Terry Rhoads and David Vestal met with Plaintiff and several union representatives to discuss Plaintiff's ongoing performance issues. They gave Plaintiff three options: (1) he could accept reassignment to Metro Transit Operations as a Bus Operator with the option to return to Rail as a Rail Operator at the first opening; (2) he could remain at Rail as a RSIT with a two month extension of his probation through May 14, 2016 which would allow him time to retrain in all three major areas of the program (LCC, Dispatch, and Field Supervision) and address his deficiencies; or (3) he could decline both options (1) and (2) and be released from the RSIT for failing to meet performance standards effective February 14, 2014. Dkt. # 24 at ¶ 17, Ex. H. Plaintiff chose option (2) and signed a probation extension. *Id.*; Ex. H. As a condition of the February 14, 2014 probation extension, Plaintiff was required to undergo "Rail defined" refresher training, including "Rail Dispatcher training with an emphasis on daily schedule planning, call sheet records and distribution of documents." *Id.* Between March 5, 2014 and March 7, 2014, Plaintiff completed a refresher training on those topics with Jami Kai, who reported

that he did very well.  Plaintiff received no deduction in pay or benefits for completing this refresher training.  *Id.* at ¶¶ 19-20.

Plaintiff alleges that he had a conversation with Defendant Michael Avery on February 18, 2014 where Mr. Avery told him "They don't want you here.  Paul Dennison (phonetic), John Arrow (phonetic) – who I never even met – don't want you here."  Dkt. # 21, Ex. A, at 79:10-12; 81:16-25.  These individuals worked at Sound Transit, which does not have hiring or firing power over RSITs after it contracted out operation of Link Light Rail to King County Metro.  Dkt. # 23, ¶ 16.  However, Mr. Avery testified that he did not tell Plaintiff that Plaintiff was being discriminated against due to his accent and National Origin.  Dkt. # 21, Ex. D, at 35:4-18.

On March 18, 2014 a Rail Operator reported to the LCC that he observed a surveyor on the imbedded are between the two rail tracks at Cloverdale Street.  Dkt. # 24, ¶ 23. The operator indicated that the surveyor was not blocking the track, but had a tripod and was close.  Plaintiff responded shortly afterwards – on the open radio which could be heard by all operators – that he had made contact with the unauthorized personnel near the tracks and they would be leaving in about 15 minutes.  *Id.*  Chief Alfred Azen stepped in, instructing Plaintiff to call him on the phone.  At first, Plaintiff said that the surveyors in question were not in the right of way, but later admitted that they were in the right of way.  *Id.*, Ex. L; *see also* Dkt. # 21, Ex. B, at 119:1-25.  After the incident (hereafter, the "right of way" or "ROW incident"), Mr. Vestal testifies that Plaintiff said the crew was not in the track area and outside of the right of way; however, video recording and pictures of the scene showed the surveyors were in the right of way while Plaintiff talked to them and after.  Dkt. # 24, ¶ 24, Exs. M, N.

On March 24, 2014, Mr. Vestal and Mr. Rhoads conducted an investigatory interview of Plaintiff regarding the March 18, 2014 incident.  *Id.*, ¶¶ 25-26.  During this interview, Plaintiff purportedly changed his story again and told the Chiefs that the surveyor north of Cloverdale Street was in the center of the right of way and not

in the pedestrian cage. On April 18, 2014, after consulting with Tom Jones, Michael Avery, and Rail's human resources department, Mr. Vestal terminated Plaintiff's probation. *Id.,* Ex. O.

## 2. Alleged Acts of Discrimination

Plaintiff contends that throughout 2013, in addition to the fare enforcement incident of March 7, 2013, multiple King County Rail employees ridiculed and made racist remarks about him, including mocking his African accent. Dkt. # 30, ¶ 9. Specifically, Plaintiff alleges: (1) King Country Rail Supervisor Doug Moore referred to Plaintiff as a monkey and made ape-like sounds when discussing him; (2) King County Rail Supervisor Annette James drew pictures on a whiteboard, purportedly mocking Plaintiff, one resembling him with his pants on fire, another of a nearly naked man standing beside a toilet;[2] (3) Moore and another King County Metro Rail Supervisor Kevin Winter complained that Plaintiff needed to "learn how to speak English" because they couldn't understand Plaintiff when he spoke; (4) Moore and another King County Metro employee Glenn Brockett mocked Plaintiff's accent; and (5) Glenn Winter remarked that he did not want to work with Plaintiff because of his accent. *Id.* at ¶¶ 4, 9, 10; Dkt. # 28, ¶ 40; Dkt. # 29, Ex. D at 33:11-19.

Plaintiff also alleges that he complained to management about discriminatory treatment as follows: (1) on March 8 and 20, 2013, to his direct supervisor Tom Jones that his treatment during the fare enforcement incident was racially discriminatory; (2) in September 2013, to his supervisor Chief David Vestal that Glenn Brockett was mocking his accent; (3) at some point, to Carlton Pleasant that he was being treated unfairly; (4) on March 18, 2014, to the EEOC after he was told he would be disciplined for the ROW incident; and (5) on April 2, 2014, to Chief Vestal that he was being singled out for discipline on account of his race. Dkt. # 28, ¶¶ 34, 36, 64, 65; Dkt. # 29 Ex. A, at 13:8-13; Ex. F at 23:8-15.

---

[2] Ms. James, in her deposition, denies making these drawings. Dkt. # 29, Ex. I, at 43:5-25, 44:1-11.

On August 4, 2017, Plaintiff filed his Complaint against King County, Tom Jones, Josh Shield, Terry Rhoads, Michael Avery, and other unidentified individuals in King County Superior Court. Dkt. # 1-1. Defendants removed to this Court on September 20, 2017. Dkt. # 1. Plaintiff's Complaint alleges three causes of action; racial discrimination and retaliation under 42 U.S.C. § 1981, and racial discrimination under 42 U.S.C. § 1983. Dkt. # 1-1.

## II.    LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000). Credibility determinations and the weighing of the evidence are jury functions, not those of a judge. *Anderson*, 477 U.S. at 255.

However, the court need not, and will not, "scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996);

*see also, White v. McDonnel-Douglas Corp.*, 904 F.2d 456, 458 (8th Cir. 1990) (the court need not "speculate on which portion of the record the nonmoving party relies, nor is it obliged to wade through and search the entire record for some specific facts that might support the nonmoving party's claim"). The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). Uncorroborated allegations and "self-serving testimony" will not create a genuine issue of material fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *T.W. Elec. Serv. V. Pac Elec. Contractors Ass'n*, 809 F. 2d 626, 630 (9th Cir. 1987).

## III.    DISCUSSION

### A.    Claims Under 42 U.S.C. § 1983

Defendant claims that Plaintiff's claims arising under Section 1983 are time-barred. Dkt. # 20 at 16-17. In deciding claims under Section 1983, federal courts borrow state statutes of limitations and the Washington State statute applicable to Section 1983 claims provides for a three-year statute of limitations. *Joshua v. Newell*, 871 F.2d 884, 886 (9th Cir. 1989). Plaintiff concedes this point, and the Court agrees with the parties that Plaintiff's Section 1983 claims are all barred by the appropriate statute of limitations. Dkt. # 27 at 1. Plaintiff was terminated on April 18, 2014, and did not file his Complaint until three years and four months later on August 17, 2017. Dkt. # 1-1.

Accordingly, the Court **GRANTS** Defendants' Motion on this point and **DISMISSES** Plaintiff's Section 1983 claims. *See, e.g., Ismail v. Amazon.com*, No. C16-1682JLR, 2018 WL 2684391, at *10 (W.D. Wash. June 5, 2018), *reconsideration denied*, No. C16-1682JLR, 2018 WL 3303141 (W.D. Wash. July 5, 2018) (granting summary judgment for the defendant because the plaintiff conceded that the court should dismiss her claim) (citations omitted).

B.  <u>Race Discrimination in Violation of 42 U.S.C. § 1981</u>

Plaintiffs remaining claims for racial discrimination and retaliation both arise under 42 U.S.C. § 1981.  Dkt. # 1-1.  The Court analyzes Plaintiff's federal race discrimination claims under the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Surrell v. California Water Service Co.*, 518 F.3d 1097, 1105 (9th Cir. 2008) ("Typically, we apply the familiar *McDonnell Douglas* burden shifting framework for Title VII and § 1981 claims. . . . A plaintiff may alternatively proceed by simply producing 'direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the employer.'") (citations omitted).

Under the *McDonnell Douglas* framework, in order to satisfy his burden on the race discrimination claims, a plaintiff must establish a prima facie case of racial discrimination.  *McDonnell Douglas Corp.*, 411 U.S. at 802.  To do so, he must show that (1) he belonged to a protected class; (2) he was performing his job in a satisfactory manner; (3) he was subjected to an adverse employment action; and (4) similarly situated employees not in his protected class received more favorable treatment.  *Kang v. U. Lim Am., Inc.,* 296 F.3d 810, 818 (9th Cir. 2002); *Chuang v. Univ. of Cal. Davis,* 225 F.3d 1115, 1123 (9th Cir. 2000).  "The requisite degree of proof necessary to establish a prima facie case . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 659 (9th Cir. 2002) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)). If a plaintiff successfully establishes a prima facie case for race discrimination, the burden of production shifts to the defendant to show a legitimate, non-discriminatory reason for its action.  *McDonnell*, 411 U.S. at 802.  The burden then shifts back to the plaintiff to show that the defendant's reasons were pre-textual.  *Id.* at 804.

Despite this burden shifting, the ultimate burden of persuading the trier of

fact that the employer intentionally discriminated remains at all times with the plaintiff. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000); *Norris v. City of San Francisco*, 900 F.2d 1326, 1329 (9th Cir. 1990). To avoid summary judgment, a plaintiff "must do more than establish a prima facie case and deny the credibility of the [defendant's] witnesses." *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) (quoting *Wallis*, 26 F.3d at 890). Plaintiffs must produce "specific, substantial evidence of pretext." *Id.* An employee's subjective personal judgments of his competence alone do not raise a genuine issue of material fact. *Bradley*, 104 F.3d at 270 (citing *Schuler v. Chronicle Broadcasting Co., Inc.*, 793 F.2d 1010, 1011 (9th Cir. 1986)).

There is no doubt that Plaintiff is a member of a protected class. The parties also do not dispute that Plaintiff was subject to adverse employment actions through his termination and probation extensions.[3] Therefore, to establish a prima facie case, Plaintiff must show he was performing his job satisfactorily, and similarly situated employees not in his protected class received more favorable treatment.

### 1. *Whether Plaintiff was performing his job in a satisfactory manner*

Defendants contest that every identified adverse employment action was taken because Plaintiff was not performing up to King County's expectations. Dkt. # 20 at 19-24. Plaintiff's termination letter, for instance, lists the following bases for Plaintiff's probation termination: (1) his lapse in judgment in interacting with Fare Enforcement and Sound Transit Police in March of 2013; (2) his inability to handle simultaneous events while working in the LCC; (3) continuing to perform peak hour ride checks after he was instructed not to; (4) failing to follow the "extra" supervisor

---

[3] Defendants argue that other events alleged to be adverse employment actions in Plaintiffs' discovery responses, such as the March 7, 2013 fare enforcement incident itself, the February 18, 2014 conversation, and March 8, 2014 oral reminder and retraining, do not constitute such action because they did not affect Plaintiff's "compensation, workplace conditions, responsibilities, or status." *Burlington Northern and Santa Fe Railway Co. v. Shiela White*, 126 S.Ct. 2405, 2407(2006); Dkt. # 20 at 19, 21. Plaintiff does not contest this argument, and the Court agrees that these events themselves do not constitute adverse employment actions because they did not materially affect Plaintiff's employment.

protocol of coordinating work activities with the regular supervisor; (5) questioning job duty assignments, such as operating a train to maintain service; (6) failing to use cameras and SCADA to prevent a service delay; (7) belligerence (argumentative and disrespectful behavior) related to a work assignment; (8) failure to follow the Right of Way ("ROW") protocol, including failure to request the proper credentials from the surveyors on the ROW, and failure to properly identify that the surveyors were in the ROW; and (9) changing his story multiple times about the ROW incident. Dkt. # 24, Ex. O.

The Court agrees that for every event except the March 2013 fare enforcement incident,[4] these proffered reasons indicate that Plaintiff was not meeting the legitimate expectations of an RSIT at King County Metro. Plaintiff largely does not contest these allegations that his on-the-field performance, at times, fell below the standard expected of RSITs. Instead, Plaintiff mainly argues that there is a question of fact as to whether the claim of unsatisfactory performance "was in and of itself a pretext to cover up their desire to fire him." Dkt. # 27 at 19.[5] This argument goes to pretext, but does not help to create a prima facie case on the legitimate expectations element. Plaintiff does, however, briefly point to evidence of satisfactory performance in Plaintiff's test scores and evaluations by his class instructors. Dkt. # 27 at 19. This evidence demonstrates that Plaintiff certainly had the intelligence and potential to succeed as an RSIT, but does not refute the evidence that Plaintiff's actual, real-time job performance fell below this potential. Importantly, Plaintiff does not contest that he fell below expectations by

---

[4] The Court strains to see the logic in punishing Plaintiff for his reactions to being the target of likely racial profiling. As discussed below, the Plaintiff had very few good options in the March 2013 fare enforcement incident and King County's response to punish him for not deescalating a situation he was not responsible for is severely lacking in awareness and sensitivity.

[5] Plaintiff also alleges that he "produced evidence that the complaints of poor performance were contradicted by objective evidence that he was not at the office during the times defendants allege his misconduct," but does not clarify what evidence this is. Dkt. # 27 at 19. Plaintiff also fails to refute the evidence in the record of contemporaneous accounts of Plaintiff's lapses in performance, and of those Plaintiff admits to, such as the ROW incident.

ORDER - 13

mishandling the ROW incident.  Plaintiff conceded that expecting RSITs to accurately understand and apply the ROW rules is a reasonable expectation from his employer, that King County stresses ROW protocol knowledge heavily and there's "no operator" who doesn't understand ROW, that he received adequate training in ROW, and that he failed to meet this expectation in the ROW incident, a failure that could have led to serious injury or death.  Dkt. # 36, Ex. F at 98:11-14, 101:4-23, 204:20-23, 205:3-23, 208:12-15, 212:2-6.

Accordingly, the Court finds that Plaintiff has not met his prima facie standard.  Though Plaintiff's cited test scores evaluations evidence that he tested well and was clearly very intelligent and capable of performing well at his position, his subsequent lapses in performance in the field show that he was not meeting his employer's legitimate expectations.  Importantly, Plaintiff admitted that he made a serious mistake with regard to the ROW incident.  At the very least, King County Metro has a legitimate expectation that rail supervisors understand and apply right-of-way protocol consistently and correctly, and Plaintiff fell below this expectation.  Although case law provides a liberal and minimum threshold requirement for Plaintiff to meet his burden at this stage, based on the record and arguments provided, Plaintiff fails to clear this basic hurdle.

2.  *Whether similarly situated employees not in Plaintiff's protected class received more favorable treatment*

Even if Plaintiff had satisfied the other elements of a prima facie racial discrimination case, Plaintiff also fails on the fourth element.  Plaintiff argues that he does not need to demonstrate that similarly situated individuals outside his protected class were treated more favorably.  Dkt. # 43 at 12, 13.  Instead, Plaintiff argues that he may establish the fourth prong of his prima facie case of race discrimination by "producing evidence of other circumstances surrounding the adverse employment action which give rise to an inference of discrimination[.]"  Dkt. # 43 at 12 n. 1;

*Knight v. Brown*, 797 F. Supp. 2d 1107 (W.D. Wash. 2011).

Plaintiff identifies several other alleged safety-related incidents where other King County employees were either not disciplined or received little discipline, including: (1) on February 26, 2013, fellow RSIT Santiago Maciel ran an amber signal, and was suspended for one day but received no probation extension; (2) on March 5, 2013, fellow RSIT Wachtel opened the doors of a train on the wrong side, and was suspended for one day but received no probation extension; (3) in 2012, Doug Moore opened the door on the wrong side and failed to attend a pre-disciplinary meeting, but was not disciplined; and (4) Annette James was found sleeping on the job but was not disciplined.[6]  Dkt. # 28, ¶¶ 71-73; Dkt. # 29, Ex. G, at 50:14-15. Plaintiff claims, therefore, that the stated bases for his probation extensions and termination were not valid grounds.  Dkt. # 27 at 20.

The Court finds this argument unpersuasive.  First, both of Plaintiff's fellow RSITs, Maciel and Wachtel, received the same discipline Plaintiff did when he committed the same infractions as an operator.  Dkt. # 36, 18:14-19:15; Dkt. # 38, ¶¶ 8-9, Exs. G, H.  The other two employees, Moore and James, were not RSITs.  Second, Plaintiff is the only RSIT who is documented to have disregarded the ROW rules in such a fashion as he did in the ROW incident.  Defendants persuasively argue that the ROW incident, where even a momentary misunderstanding of the right-of-way rules could have led to fatalities, is different in kind and seriousness from other violations such as having sex in a work truck.  Dkt. # 27 at 17; Dkt. # 35 at 12.  By misapplying the ROW protocol that King County stresses with great importance for all of its RSITs to know and understand, Plaintiff admits he put people, specifically the trespassing surveyors, in danger of being hit by a train.  Dkt. # 36, Ex. F at 204:20-23, 212:2-6. The Court finds that this proffered reason for Plaintiff's discharge, which Plaintiff largely admits to, is not "fabricated" and does not reflect treatment that is disparate

---

[6] As Plaintiff argues, discipline is at the discretion of Rail Manager, Defendant Michael Avery, and he has "flexibility" in the amount given.  Rhoads Dep. at 12:4-24.

from Plaintiff's similarly-situated colleagues.

Ultimately, because Plaintiff has failed to provide evidence under a direct or circumstantial theory or under a theory that similar situated individuals outside his protected class received more favorable treatment, he failed to establish a prima facie case of race discrimination.

### 3. Legitimate, Nondiscriminatory Reason and Pretext

The Court finds that Plaintiff failed to meet his burden at the first step of *McDonnell Douglas*; that is, he failed to establish a prima facie case for race discrimination. Nonetheless, the Court will address Defendant's proposed legitimate, nondiscriminatory reasons for terminating Plaintiff, as well as Plaintiff's argument that Defendant's reasons are pretextual.

Defendant need only articulate "some" legitimate, nondiscriminatory reason for subjecting Plaintiff to adverse employment actions. *McDonnell Douglas,* 411 U.S. at 802. Defendant's burden at this stage is one of production, not persuasion. *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1123–24 (9th Cir. 2000). Defendants have largely met this burden. Defendants provide evidence that while acting as an RSIT, Plaintiff committed several serious safety violations, such as misapplying right-of-way protocol, and had several performance lapses which led to significant service delays. Defendant stated that Plaintiff's probation extensions were due to multiple performance lapses in the field, which created delays, congestion, and unsafe situations, and refusing to take constructive criticism. Finally, Defendant stated that Plaintiff's ultimate termination was due primarily to his handling of the ROW incident. The ROW incident, especially, was not a minor transgression: it was a serious lapse in performance that could have subjected people to mortal danger. Defendant's stated reasons for terminating Plaintiff's employment—Plaintiff's poor performance and safety violations, especially with regard to the ROW incident—are legitimate, nondiscriminatory reasons, and

therefore Defendant has met its burden under *McDonnell Douglas*.

Ultimately, having found that Defendants met their burden, Plaintiff then carries the ultimate burden of persuasion to establish that Defendant's proffered reasons for terminating Plaintiff or extending Plaintiff's probation were merely pretext for a decision that was actually based on racial animus. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993) ("The plaintiff then has 'the full and fair opportunity to demonstrate,' through presentation of his own case and through cross-examination of the defendant's witnesses, 'that the proffered reason was not the true reason for the employment decision,' and that race was. He retains that 'ultimate burden of persuading the [trier of fact] that [he] has been the victim of intentional discrimination.'") (citations omitted).

Plaintiff's argument that Defendant's proffered reasons for termination were pretext for a decision seeped in racial animus is based on conclusions and inferences that are not currently supported by the record before the Court. Similarly, Plaintiff fails to show how the probation extensions were motivated by racial animus from the relevant decision-makers. Plaintiff points to a number of racist and offensive statements purportedly made by "supervisors," but fails to attribute any of these statements to any supervisor with any decision-making authority over Plaintiff's employment status.[7] Because none of these employees were decision-makers with regards to Plaintiff's adverse employment actions, their actions cannot by themselves be imputed to King County. *See, e.g., Williams v. City of Bellevue*, No. 2:16-CV-01034-RAJ, 2017 WL 4387590, at \*5 (W.D. Wash. Oct. 3, 2017), *aff'd*, 740 F. App'x 148 (9th Cir. 2018) ("The only evidence of discriminatory intent that Plaintiff offers is Quayle's text message. However, Quayle was not the decision maker with regard to Plaintiff's termination."). Plaintiff offers little in the way of argument or record citations to connect these alleged actions to his termination or probation extensions.

---

[7] While this evidence may have supported a hostile work environment claim, as Defendants point out, Plaintiff is not asserting such a claim in this lawsuit. Dkt. # 1-1.

Plaintiff halfheartedly makes reference to the "cats-paw" theory articulated in *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011), wherein the discriminatory animus of a non-decision maker may be attributed to a decision maker, but does not specify what evidence in the record supports this inference. Dkt. # 27 at 24. Instead, Defendants contend that the relevant decision makers (Mr. Rhoads, Mr. Vestal, Mr. Avery, and Mr. Jones) did not engage in this racist conduct or display racial animus, and Plaintiff fails to point to record citations to dispel this notion, as none of the perpetrators (Moore, Winter, Shields, or James) Plaintiff identifies appear to have had any management authority over him. Dkt. # 27, ¶ 4. Also, while the decision to extend Plaintiff's probation for his "escalation" of the March 2013 fare enforcement incident was shortsighted, lacking in empathy, and indifferent to the very legitimate concerns that Plaintiff was singled out because of his race, it did not evidence a decision to punish Plaintiff on account of his race.

Even if Plaintiff had successfully proven that Defendants' reasoning in extending or terminating his probation was illegitimate, he still did not meet his burden to show that Defendants terminated him because of his race, a requirement for these claims. At this stage, Plaintiff must do more than merely disprove Defendant's justification; Plaintiff must affirmatively point to evidence that race was at the heart of Defendants' decision to subject Plaintiff to adverse employment actions. *St. Mary's Honor Ctr.*, 509 U.S. at 508-520. Plaintiff fails to do so.

Finally, Plaintiff also argues that the Court may look beyond the *McDonnell Douglas* standard, and directly to Plaintiffs' evidence of discriminatory intent, such as the "me too" evidence of other employees who have alleged discrimination, to find a prima facie case of racial discrimination. Dkt. # 27 at 24. It is true that courts analyzing disparate treatment claims in different contexts than the one at hand have found that the *McDonnell Douglas* framework was "was never intended to be rigid, mechanized, or ritualistic." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577

(1978).  In a similar vein, the Ninth Circuit has recognized that a plaintiff "must offer evidence that '[give[s] rise to an inference of unlawful discrimination,' **either** through the framework set forth in *McDonnell Douglas Corp. v. Green* **or** with direct or circumstantial evidence of discriminatory intent." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003), *as amended* (Jan. 2, 2004) (citations omitted) (emphasis added).

Even under this standard, Plaintiff fails to adequately provide citations to the record of discriminatory animus on the part of the relevant decision-makers at King County.  Plaintiff's collection of highly offensive racist statements, if accurate, paints a picture of a work environment at King County where highly offensive racist and nationalist behavior is left unchecked, which may be considered hostile and could help to explain some of Plaintiff's reactions to his colleague's behavior.  However, Plaintiff is not making a hostile work environment claim in this lawsuit; he is alleging claims of racial discrimination and retaliation against him by King County and his direct supervisors through his termination and probation extensions.  Dkt. # 1-1.  Again, although Plaintiff provides alleged offensive and racist statements of various coworkers, he does not show any specific or substantial direct or circumstantial evidence of his supervisors operating under any such sentiment when they took the adverse employment actions against him.  Plaintiff does not connect these discriminatory remarks to his termination; rather, Plaintiff alleges that the stated bases for his discharge were "fabricated" and not worthy, or that institutionalized racism was "pervasive and deeply ingrained in the fabric of defendant's decision-making culture."  Dkt. # 27 at 14, 20.  These accusations are not supported by any record citations provided by Plaintiff.  Even if a jury considered these comments to be circumstantial evidence of discriminatory animus by King County as a whole, Plaintiff fails to show how it was "more likely than not" that Plaintiff's probation extensions and termination were motivated by racial animus, rather than by Plaintiff's well-

documented performance lapses.  *See, e.g., Vazquez*, 349 F.3d at 640-41 (finding that the plaintiff did not show a proper nexus between the discriminatory remarks and the subsequent employment decisions.  Because the plaintiff could not show evidence of discriminatory intent, the court found that he needed to proceed under the *McDonnell Douglas* framework to succeed on his prima facie case).

Ultimately, Plaintiff did not carry his burden at the prima facie stage of *McDonnell Douglas*.  His burden at the pretext stage is even higher.  Nor did Plaintiff adequately allege that Defendants discriminated against him based on his race.

Accordingly, the Court **GRANTS** Defendant's Motion with regard to Plaintiff's race discrimination claim under Section 1981, and **DISMISSES** this claim.  The Court, however, notes that this outcome should not act as a wholesale endorsement of Defendants' actions and inactions.  While the record before the Court indicates that Plaintiff had a number of performance lapses that King County may have been justified in discipling him for, the March 2013 fare enforcement incident is of a different character.  From the facts presented, the Court is hard-pressed to see how the actions by the Fare Enforcement Officers in this incident did not amount to racial profiling.  The Officers' refusal to believe or even attempt to confirm Plaintiff's position and story despite Plaintiff providing legitimate identification, coupled with the Fare Enforcement Officers' apparent mocking tone and their own escalating behaviors, indicate that their actions were racially motivated.  While Plaintiff may not have chosen the best course of action in locking himself in an employees-only compartment to prove his identity, the situation left Plaintiff with very few good options.

Instead of addressing Plaintiff's legitimate grievance about how he was treated during this incident, and of how he was likely singled out because of his race by the Fare Enforcement Officers, his employer buried its head in the sand.  King County

extended Plaintiff's probation because of his "escalation" of the fare enforcement incident, which they say falls below the composure standards expected of RSITs.[8] Dkt. # 20 at 19. The Court finds that this response displays an alarming amount of indifference and apathy. It is difficult to see how Plaintiff could feel as if he was in a supportive environment when his employer punished him for being an apparent victim of racially targeted policing. While King County's probation extension decision may, by virtue of its singular focus on Plaintiff's behavior, bear the trappings of a "legitimate" and "nondiscriminatory" action, in reality it worked to sweep what appears to be a lingering problem with race at King County Metro even further under the rug. Defendants may have technically complied with the requirements of *McDonnell Douglas* by punishing Plaintiff and focusing solely on Plaintiff's questionable behavior. They ignored, however, the racially tinged behavior of the Fare Enforcement Officers that triggered Plaintiff's reaction in the first place. Defendants contributed to a work environment where racism could be ignored and tolerated without significant repercussions. This behavior may not have exposed Defendants to liability in this case based on the claims and record presented, but it should nonetheless serve as a heavy reminder to King County that any employer, especially a governmental entity, should hold itself to a standard above a baseline level of ignorance about race.

C. Retaliation in Violation 42 U.S.C. § 1981

To establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) he engaged in a statutorily protected activity, (2) defendants took some adverse employment action against him, and (3) there is a causal connection between the protected activity and the discharge. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d

---

[8] Although not raised by the parties, based on the current record, the Court is skeptical that the March 7, 2013 fare enforcement incident and the resulting probation extension could serve as the basis for a valid Section 1981 claim because these events are outside of the relevant statute of limitations period. Claims brought pursuant to 42 U.S.C. § 1981 are subject to the federal "catch-all" four year limitations period. *Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369 (2004); 28 U.S.C. § 1658. In this case, Plaintiff filed his Complaint on August 17, 2017, which is more than four years after both the incident and the probation extension. Dkt. # 1.

ORDER - 21

1054, 1065-66 (9th Cir. 2002). If a plaintiff establishes a prima facie case, the evidentiary burden shifts to the employer to produce admissible evidence of a legitimate, nondiscriminatory reason for the discharge. *Stegall v. Citadel Broad. Co.,* 350 F.3d 1061, 1066 (9th Cir. 2003), *as amended* (Jan. 6, 2004). If the employer meets its burden, the presumption is removed and the employee must then establish a genuine issue of material fact as to pretext. *Id.*

Here, there is no question that Plaintiff engaged in a protected activity when he complained to his supervisors that he felt he was being treated differently because of his race. There is also little dispute that Plaintiff was subject to adverse employment actions in his probation extensions and termination. As for the third element, Plaintiff asserts that the temporal connection between his complaint and his termination is sufficient causal connection to set forth a retaliation claim. Dkt. # 27 at 23. The causal link element for retaliation claims "can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action." *Dawson v. Entek Int'l,* 630 F.3d 928, 936 (9th Cir. 2011); *see also Villiarimo,* 281 F.3d at 1065 (stating that to support "an inference of retaliatory motive, the [adverse action] must have occurred fairly soon after the employee's protected expression"). However, as discussed above, the record shows that Plaintiff was performing below King County Metro's legitimate expectations, and Plaintiff was terminated after an investigation into his actions during the ROW incident. Aside from temporal proximity, Plaintiff offers little evidence that his engaging in protected activity was a factor at all, much less a "but-for cause," in his probation extensions or termination. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 360 (2013) ("[R]etaliation claims must be proved according to traditional principles of but-for causation.").

Even if Plaintiff had succeeded in proving causation, the Court would again conclude that Defendants have, for the most part, provided legitimate,

nondiscriminatory reasons for each adverse employment action, such as Plaintiff's performance lapses; specifically, his handling of the ROW incident, which potentially subjected trespassing surveyors to physical danger. While the Court is again extremely skeptical of the wisdom and sensitivity in exacting any discipline of Plaintiff for behavior arising out of the March 2013 fare enforcement incident, the reason given (Plaintiff's escalating behavior in a stressful situation) do not appear to be connected in any way to Plaintiff's protected activity.

The burden would then return to Plaintiff to provide evidence of pretext. *Davis v. Team Elec. Co*., 520 F.3d 1080, 1094 (9th Cir. 2008). "The plaintiff may show pretext either (1) by showing that unlawful discrimination more likely motivated the employer, or (2) by showing that the employer's proffered explanation is unworthy of credence because it is inconsistent or otherwise not believable." *Dominguez–Curry v. Nev. Transp. Dep't,* 424 F.3d 1027, 1037 (9th Cir. 2005). "Circumstantial evidence of pretext must be specific and substantial in order to survive summary judgment." *Bergene v. Salt River Project Agr. Imp. & Power Dist*., 272 F.3d 1136, 1142 (9th Cir. 2001). Merely denying the credibility of the employer's proffered reasons is insufficient to withstand summary judgment. *Lindsey v. Shalmy*, 29 F.3d 1382, 1385 (9th Cir. 1994).

The Court again concludes that Plaintiff has not met his burden to show that any adverse employment action taken against him was a pretextual cover to retaliating against him due to his protected activity. Plaintiff presents no evidence that Plaintiff's race, or his complaints, were in any way a motivating factor to the relevant decision makers that extended Plaintiff's probation and terminated his employment. Plaintiff's temporal proximity argument is not, by itself, sufficient to show pretext, as it is not accompanied by supporting evidence that Plaintiff, for instance, received better scores or evaluations before his complaints than after. *See, e.g., Bell v. Clackamas Cnty*., 341 F.3d 858, 862–864, 866 (9th Cir. 2003) (temporal

proximity sufficient where plaintiff had positive training scores prior to complaint of racial harassment, but poor reviews, suspension, and termination closely followed plaintiff's complaint). The limited circumstantial evidence Plaintiff does submit of other non-supervisory King County employees' behavior is not specific or significantly probative enough to show pretext. *Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1095–96 (9th Cir. 2005) ("[Circumstantial evidence] must be specific and substantial to defeat the employer's motion for summary judgment.") (internal quotations omitted)).

Plaintiff argues, without providing citations to the record, that King County's actions in extending and terminating Plaintiff's probation were based on a list of transgressions that were "contrived by management to build a case for his discharge," but this assertion is not supported by evidence. Dkt. # 27 at 22-23. Instead, the record shows that Plaintiff's performance lapses were continuously detailed over the entirety of his probation, a pattern that did not change after or while Plaintiff made his complaints. The record indicates that Defendants were already concerned about Plaintiff's performance lapses and had extended his probation multiple times, and were considering action after the ROW incident, before and while Plaintiff made his complaints. Dkt. # 24, Ex. N. Instead of retaliating against Plaintiff for his protected activity, the record reflects that King County took pains to avoid the issue of race altogether. This laissez-faire attitude toward race worked to the detriment of approaching the March 2013 fare enforcement incident with the required level of sensitivity and clarity about the role Plaintiff's race played in that incident. While the record is barren of indications that Plaintiff was punished for filing complaints about discriminatory behavior from his colleagues, it also evidences an employment environment that did not treat Plaintiff's complaints with the appropriate amount of seriousness. However, based solely on the record and claims before the Court, Defendants' apathetic approach toward Plaintiff's

complaints do not expose them to liability for Plaintiff's retaliation claim under Section 1981.

Accordingly, for the reasons stated above, the Court **GRANTS** Defendants' motion with regard to Plaintiff's Section 1981 retaliation claim, and **DISMISSES** this claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment.  Dkt. # 20.[9]

Dated this 18th day of January, 2019.

_____
The Honorable Richard A. Jones
United States District Judge

---

[9] Because the Court is granting Defendants summary judgment, it need not address the portions of Defendants' Reply briefing that purport to be a motion to strike portions of Plaintiff's Opposition and Declarations.

ORDER - 25